UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARY KAY INC., | § | |
| | § | C.A. NO.: |
| Plaintiff, | § | |
| v. | § | DEMAND FOR JURY TRIAL |
| | § | |
| BEYOU-COSMETICS STOREFRONT | § | |
| ON WWW.EBAY.COM, and JOHN | § | |
| DOES 1-10, individually or as | § | |
| corporations/business entities, | § | |
| | § | |
| Defendants. | | |

_____

**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR
VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), 15 U.S.C. § 1125(c),
AND RELATED CLAIMS**

Plaintiff Mary Kay Inc. ("Mary Kay") brings this action against Beyou-Cosmetics Storefront on www.ebay.com and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (4) trademark dilution in violation of Tex. Bus. & Com. Code § 16.103; (5) trademark infringement and unfair competition under Texas common law; and (6) tortious interference with existing contracts and business relationships. These claims arise from Defendants' misappropriation of Mary Kay's trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Mary Kay's trademarks to unwitting customers. In support of its complaint, Mary Kay alleges as follows:

## PARTIES

1.      Mary Kay is a corporation, organized under the laws of Delaware, with its principal place of business at 16251 Dallas Parkway, Addison, Texas 75001.

2.      Beyou-Cosmetics Storefront on www.ebay.com (the "Storefront") is an online storefront on www.ebay.com ("eBay") called "beyou-cosmetics" that can be accessed at https://www.ebay.com/usr/beyou-cosmetics.  Upon information and belief, the Storefront is a sole proprietorship, partnership, or business entity owned by John Does 1-10, whose identities will be revealed after initial discovery conducted by Mary Kay.  The Storefront does business throughout the United States, including in Texas.

3.      John Does 1-10 are individuals and/or entities who own and operate the "beyou-cosmetics" online storefront on eBay.  Defendants do business throughout the United States, including in Texas, through their "beyou-cosmetics" eBay storefront.

4.      The true names, involvement and capacities, whether individual, corporate, associated or otherwise, of John Does 1-10 are unknown to Mary Kay.  Therefore, Mary Kay sues these defendants by a fictitious name.  Mary Kay is informed and believes, and on that basis alleges, that each of the Defendants sued herein is responsible in some manner for the events and occurrences referred to herein or otherwise interested in the outcome of this dispute.  When the true names, involvement, and capacities of these parties are ascertained, Mary Kay will seek leave to amend this complaint accordingly.

## JURISDICTION

5.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  Mary Kay's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and its claims arising under the laws of the State of Texas

are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

6.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Texas and established sufficient minimum contacts with Texas by, among other things, advertising and selling infringing products bearing Mary Kay's trademarks to consumers within Texas through a highly interactive commercial website, through the regular course of business, with knowledge that Mary Kay is located in Texas and is harmed in Texas as a result of Defendants' sales of infringing products to Texas residents.  Mary Kay's claims arise out of Defendants' sales of infringing products bearing Mary Kay's trademarks to Texas residents through the regular course of business.

7.     This court also has personal jurisdiction over Defendants because Defendants reside within Texas and transact business in Texas.  As discussed in more detail below, after a product was purchased from their eBay storefront, Defendants shipped a product that had a return address located in El Paso, Texas, indicating that Defendants are storing products bearing Mary Kay's trademarks and operating their eBay business within Texas.

**VENUE**

8.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Mary Kay's claims occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

**FACTUAL ALLEGATIONS**
**Mary Kay and Its Trademarks**

9.     Mary Kay is a global manufacturer and wholesale distributor of cosmetics, skin care products, toiletries, and other related products.  Mary Kay's products are sold in over thirty-

five countries, including the United States, and the Mary Kay brand is recognized for its quality worldwide.

10.     Mary Kay uses a direct-sales business model designed to ensure that consumers only receive products that meet the company's high quality standards. Mary Kay products are available to the public exclusively through Mary Kay Independent Beauty Consultants (hereafter, "Consultants"), who must enter into contracts with Mary Kay to be able to sell Mary Kay products.

11.     Mary Kay devotes a significant amount of time, energy, and resources to protecting the value of its brand, products, name, and reputation. Through its contracts with Consultants, Mary Kay requires Consultants to provide customer services and follow various quality controls including requirements relating to product storage, handling, inspection, sales channel restrictions, and providing consultation and guidance on the safe and proper use of Mary Kay products (collectively, the "Consultant Obligations"). By selling its products exclusively through Consultants, Mary Kay is therefore able to ensure the satisfaction of consumers and maintain the integrity and reputation of the Mary Kay brand. In the highly competitive cosmetics products market, product quality and customer service are a fundamental part of a consumer's decision to purchase a product.

12.     Mary Kay first began using the MARY KAY® trademark in 1963. Since that time, Mary Kay has continuously used the MARY KAY® mark in commerce in connection with the sale of cosmetics products and other types of products.

13.     To promote and protect its intellectual property rights, Mary Kay has registered numerous trademarks with the United States Patent and Trademark Office. These trademarks include, but are not limited to: MARY KAY® (U.S. Trademark Registration Nos. 0817516, 1070841, 1545983, 1842599, 2542184, 2559020, 3470956) and MK® (U.S. Trademark

Registration Nos. 2559020, 3909669, 4509594, 4509597) (collectively, the "Mary Kay Trademarks").

14.    The registration for each of the Mary Kay Trademarks is valid, subsisting, and in full force and effect.  Pursuant to 15 U.S.C. § 1065, the Mary Kay Trademarks serve as conclusive evidence of Mary Kay's ownership of the marks and of its exclusive rights to use the marks in commerce and in connection with the sale and distribution of Mary Kay's products identified in the registrations.  *See* 15 U.S.C. § 1115(b).

15.    Mary Kay actively uses and markets the Mary Kay Trademarks in commerce.

16.    Due to the quality and exclusive distribution of Mary Kay's products, and because Mary Kay is recognized as the source of high quality products, the Mary Kay Trademarks have substantial value.

### Online Marketplaces and the Threat They Pose to Mary Kay's Quality Controls, Reputation, and Goodwill

17.    E-commerce retail sales have exploded over the past decade.  From 2009 to the end of 2020, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 14.0%.  *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS (February 19, 2021), https://fred.stlouisfed.org/series/ECOMPCTSA.

18.    In 2020, consumers spent $861 billion on e-commerce sales, a 44% increase from 2019.  The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2020, United States consumers spent more than $296 billion in e-commerce sales on Amazon, a 38.6% increase from 2019.  *See* Fareeha Ali, *U.S. ecommerce grows 44.0% in 2020*, Digital Commerce 360 (January 29, 2021),  https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

19.    Although online marketplaces are becoming increasingly popular among consumers, they also greatly challenge a manufacturer's ability to control the quality and safety of its products.

20.    Unlike when purchasing products at brick-and-mortar stores or in interpersonal transactions, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

21.    Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a manufacturer's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the manufacturer's controls.

22.    Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) manufacturers who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through manufacturers' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-

of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also

common for unauthorized sellers to sell products that are previously used—including products

retrieved from dumpsters—as "new" on online marketplaces.  *See* Khadeeja Safdar et al., *You*

*Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019,

https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

23.    The business press has also reported extensively on how there is an "epidemic" of

counterfeit products being sold on the online marketplaces that unauthorized sellers are exploiting

because they know consumers trust marketplaces and think the products they are buying through

the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg,

Nov. 28, 2016,  https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-

fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets*

*of fakes*, THE WASHINGTON POST, Nov. 14, 2019,  https://www.washingtonpost.

com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-

market-fakes/?arc404=true.

24.    The problem of sales of counterfeit and other poor-quality products on online

marketplaces has become so serious that, in November 2019, the United States Senate Finance

Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-

commerce has fundamentally changed how consumers shop for products and that, as e-commerce

has grown, counterfeit goods and products that "violate a right holder's trademark or copyright"

are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that

these sales are a "significant threat" to rights holders' brands and to consumers, and that under

current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate

Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent*

*the     Sharing     of     Information     on     Counterfeits*,     Nov.     7,     2019,
https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(20
19-11-07).pdf.

25.     In its 2018 and 2019 annual reports to its shareholders, Amazon also admitted that
third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen,"
or otherwise "materially different" from the product that was described to consumers. *See*
Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at*
https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x
10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 30, 2020), *available*
*at*  https://ir.aboutamazon.com/static-files/63a014ac-bd47-42ce-b548-022a90d96e9a.  Amazon
conceded that these actions are "violating the proprietary rights of others," and warned its investors
that it could be liable for "unlawful activities" of Amazon third-party sellers.

26.     Because manufacturers have no relationship with or control over unauthorized
sellers, manufacturers have no ability to exercise their quality controls over products sold by
unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability
to exercise control over the quality of its products presents serious risks to the health and safety of
consumers—particularly when, as here, some of a manufacturer's products are applied to
consumers' bodies.

27.     Sales on online marketplaces also pose threats to a manufacturer's ability to
maintain its goodwill, reputation, and brand integrity because, when consumers purchase products
on an online marketplace, they are ordinarily not informed whether a seller of a product is
authorized by the manufacturer.  Even when sellers attempt to notify consumers that they are not
affiliated with the manufacturer, consumers usually do not see the sellers' notification and falsely

8

assume that, when they purchase products on an online marketplace, they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.

28.     As a result, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.  Because of this, when a customer purchases on an online marketplace and receives a product that is damaged, defective, expired, soon-to-expire, counterfeit, or of otherwise poor quality, the customer is more likely to associate that frustration with the brand/manufacturer than the product seller.

29.     This harm to manufacturers' reputation and goodwill is exacerbated by the fact that most online marketplaces allow customers to air their grievances about unsatisfactory products in online reviews, which are visible to anyone with an Internet connection and often remain permanently attached to brands and product listings.  Online reviews usually criticize the product manufacturer rather than the marketplace seller that sold a problem product, which causes other consumers to falsely believe that reviewers' poor experiences were the fault of the brand/manufacturer rather than because of poor quality control or customer service provided by the product seller.

30.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, Online reviews, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

31.     Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, one survey found that consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by brand owners.   Moms Place Trust in Other Consumers, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.       Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

32.     Numerous consumers have unfortunately written negative reviews of Mary Kay products that were sold on eBay.  In these reviews, consumers have given Mary Kay products low "ratings" and complained of receiving products that were expired, previously used, tampered with, defective, counterfeit, or of otherwise poor quality:







## Expired products.

Not so happy about the product.

by mshook49

Oct 07, 2019

Verified purchase: Yes | Condition: New | Sold by: juice_1212

  



## Expired product

Expired product. Do not buy.

by wgey3072

Aug 16, 2017

Verified purchase: Yes | Condition: New | Sold by: weaselsrule!

 



### Smells bad

by odbari

Jan 09, 2020

Apparently I'm allergic to this stuff. Also smells really bad. How do I know I'm not getting an expired item there's no expiration date on this

Verified purchase: Yes | Condition: New | Sold by: ilovetoshop2017



### Not sure

by hernandez412

Jul 02, 2018

I love this product and am a faithful user of it.  But this particular batch smells funny, almost sour.  Like it is old.

Verified purchase: Yes | Condition: New | Sold by: mountaingifts



## Not so good presentation of product

Delivered in a beat up box.  Looks like it's old.

by bebowl2013

Jun 29, 2020

Verified purchase: Yes | Condition: New | Sold by: jango70

 



## Disappointed

The product arrived without the protective seal, as if it were used

by denisedavila

Mar 10, 2020

Verified purchase: Yes | Condition: New | Sold by: kirichkache

 

11







It's a fake!

Not Mary Kay!

Verified purchase: Yes | Condition: New | Sold by: globalglam4you

by santog_0
Sep 23, 2019

33.     The foregoing reviews are only a small sample of the negative reviews of Mary Kay products that appear on the eBay website, and many of the reviews were written about products that Defendants have sold through their "beyou-cosmetics" storefront.  These negative reviews injure consumer perceptions of Mary Kay product quality and cause Mary Kay to suffer damage to its goodwill and lost sales.

**Mary Kay Prohibits Sales on Online Marketplaces, Exercises Strict Quality Controls Over the Production and Distribution of Its Products, and Provides a Satisfaction Guarantee for Products Purchased from Consultants**

34.    Mary Kay maintains quality control over its products by allowing Mary Kay products to be sold to end-user consumers only by Consultants.  Mary Kay enforces the quality controls that Consultants are required to follow pursuant to their contracts with Mary Kay.

35.    Mary Kay strictly prohibits its products from being sold on all online marketplaces, including eBay, in part because of the goodwill and consumer safety issues discussed above.  When Mary Kay products are sold on online marketplaces, consumers purchase poor quality products without realizing they are purchasing from unauthorized sellers who are unaffiliated with Mary Kay and who are outside of, and do not abide by, Mary Kay's quality control and customer service requirements.

36.    Mary Kay also prohibits Consultants from selling products through certain other channels, including retail or service establishments and websites.  Mary Kay prohibits sales through these channels to encourage Consultants to display and sell products in interpersonal transactions where Consultants provide customers with vital information regarding Mary Kay products and their uses.  Through person-to-person interactions, Consultants are also able to provide explanation and guidance on how to safely and properly use Mary Kay products.

37.    Mary Kay's contracts with its Consultants expressly provide that the prohibition on selling Mary Kay products on online marketplaces and other retail websites survives the termination of the contracts.

38.    Through its contracts, Mary Kay also requires Consultants to follow quality controls relating to the handling, storage, and sale of Mary Kay products.  These quality controls allow Mary Kay to maintain the integrity and quality of its products, guarantee that consumers

receive undamaged, genuine goods, and ensure that consumers receive products that meet their specific needs.

39.    As an example, Mary Kay instructs Consultants to rotate their inventory of Mary Kay products and check the manufacture date to determine whether products are expired or soon-to-be expired.  To ensure that consumers receive the freshest possible product, Mary Kay imprints each of its products with a coding system that indicates the date when the product was manufactured.  Most Mary Kay products are produced to have a shelf life of three years from the date of manufacture, which is the standard for the cosmetic industry.  For products with a shelf life of less than three years, the expiration date is clearly indicated on the product packaging.

40.    To ensure that customers receive products of the quality they have come to expect from Mary Kay, Consultants are also prohibited from altering any Mary Kay product, packaging, label, or accompanying literature.  Consultants may sell Mary Kay products only in their original packaging and formulation to prevent customer confusion and erosion in the quality and value of Mary Kay products.

41.    The Consultant Obligations also require Consultants to provide personal services to customers concurrently with and after their sales of Mary Kay products, including providing advice, answering questions, and teaching customers how to use products.  Consultants have access to literature and other educational materials developed to advise customers on each product's purpose, features, and benefits.  Consultants are thus uniquely qualified to explain best practices for safe and optimal use of Mary Kay products, and Consultants are required to provide their contact information so that customers can contact Consultants with any questions about products or completed product purchases.  Consultants are also trained and instructed to present only truthful and accurate information about Mary Kay's products and services.

42.     Mary Kay also prohibits Consultants from selling Mary Kay products to persons or entities who resell the products.  Consultants are permitted to sell products only to end-user consumers, and only in quantities that are generally purchased by consumers for personal use.  The purpose of these restrictions is to ensure that Mary Kay products are sold to consumers only by Consultants who follow Mary Kay's quality controls and over whom Mary Kay can exercise quality control.

43.     Mary Kay provides a complete money-back satisfaction guarantee (the "Satisfaction Guarantee") to consumers who purchase Mary Kay products from Consultants. Under the Satisfaction Guarantee, a consumer can receive a product replacement, product exchange, or full refund if a consumer is not completely satisfied with any Mary Kay product that the consumer purchased from a Consultant.  To receive benefits under the Satisfaction Guarantee, consumers must return the product at issue to the Consultant from whom the product was purchased.  If the Consultant is no longer active, consumers must return their product to Mary Kay along with proof of purchase.

44.     Mary Kay offers the Satisfaction Guarantee only for products that were sold by sellers who are subject to Mary Kay's quality controls and have agreed to follow its quality controls.  Because non-Consultants are not subject to Mary Kay's quality controls and Mary Kay therefore cannot ensure the quality of products sold by non-Consultants, the Satisfaction Guarantee is not available for Mary Kay products purchased from any seller that is not a Consultant.

**Mary Kay's Discovery of Defendants' Sales of Mary Kay Products on the Internet**

45.     Because the unauthorized sale of Mary Kay products over the Internet threatens the safety of consumers and the reputation and goodwill associated with the Mary Kay Trademarks, Mary Kay actively monitors the sale of Mary Kay products online.

15

46.     Through these efforts, Mary Kay discovered that high volumes of products bearing the Mary Kay Trademarks were being sold on eBay through a storefront called "beyou-cosmetics."

47.     The "beyou-cosmetics" eBay storefront does not provide any contact information or otherwise identify the operator(s) of the storefront.

48.     To gather information regarding the operator(s) of the "beyou-cosmetics" eBay storefront, Mary Kay arranged for a Mary Kay product to be purchased from the storefront in December 2020.  The product that was received had a return address located in El Paso, Texas (the "Lonesome Dove Address").

49.     Through investigation, Mary Kay learned that there is a residence located at the Lonesome Dove Address that is owned by two individuals (the "Residents").  Neither Resident of the Lonesome Dove Address is or has ever been a Consultant, and Mary Kay has not shipped any of its products to the Lonesome Dove Address.

50.     On or around January 27, 2021, Mary Kay emailed and mailed a letter to the Residents of the Lonesome Dove Address.  The letter explained that, after Mary Kay had caused a product to be purchased from the "beyou-cosmetics" eBay storefront, Mary Kay received a product that listed the Lonesome Dove Address as the return address for the product's sender. Mary Kay explained further that the Residents were infringing on the Mary Kay Trademarks through their online sales and tortiously interfering with Mary Kay's contracts by purchasing products from Mary Kay Consultants, who are prohibited from selling products to non-Consultants who resell the products.

51.     The Residents contacted counsel for Mary Kay after they received Mary Kay's letter.  The Residents admitted that they reside at the Lonesome Dove Address but asserted that they do not operate the "beyou-cosmetics" eBay storefront, do not possess or resell Mary Kay

products, and do not know why a product purchased from the "beyou-cosmetics" eBay storefront listed their residence as a return address.

52.     Through further investigation, Mary Kay has not been able to identify the true operator(s) of the "beyou-cosmetics" storefront.  Accordingly, Mary Kay has named John Does 1-10 as the operators of the "beyou-cosmetics" storefront, but will amend its complaint once it has learned the identity of the operators(s) of the storefront.

53.     Upon information and belief, the operator(s) of the "beyou-cosmetics" storefront are not Mary Kay Consultants.  Mary Kay has no records of any Consultants who have resided at or who are otherwise connected to the Lonesome Dove Address.  In the event Mary Kay learns that one or more operators of the storefront is a Consultant, however, Mary Kay will amend its claims.

54.     Defendants have sold—and are continuing to sell—a very high volume of infringing products bearing the Mary Kay Trademarks through their "beyou-cosmetics" eBay storefront.  Mary Kay uses monitoring software that allows it to track products bearing Mary Kay's trademarks that Defendants have listed for sale on their "beyou-cosmetics" eBay storefront and see how many products they have sold.  The monitoring software shows that, since February 2020, Defendants have sold more than 27,000 infringing products through their "beyou-cosmetics" storefront for revenue in excess of $500,000.  Information contained in Defendants' eBay listings also suggests that Defendants may have been selling products bearing Mary Kay's trademarks since 2017, before the monitoring software was in place.

55.     Upon information and belief, through their "beyou-cosmetics" eBay storefront, Defendants accept and fulfill orders from Texas residents for products bearing the Mary Kay Trademarks and cause infringing products bearing the Mary Kay Trademarks to be shipped to

persons located in Texas through the regular course of business.  In addition, based on the return address that was on the product Mary Kay purchased from the "beyou-cosmetics" eBay storefront, it appears that Defendants reside within Texas and store products bearing the Mary Kay Trademarks in Texas.

**Defendants Are Infringing the Mary Kay Trademarks by Selling Products Bearing the Mary Kay Trademarks That Are Not Subject To, Do Not Abide By, and Interfere With Mary Kay's Quality Control and Customer Service Requirements**

56.     Defendants, without authorization from Mary Kay, have sold—and are currently selling—products bearing the Mary Kay Trademarks through their "beyou-cosmetics" eBay storefront.  Defendants may also be selling products through additional channels that Mary Kay has not yet discovered, and cannot discover until it is able to take discovery.

57.     Mary Kay has implemented quality control and customer service requirements throughout its authorized channels of distribution.  The products sold by Defendants are not genuine Mary Kay products because they are not subject to, and interfere with, Mary Kay's quality control and customer service requirements that Consultants must follow.

58.     Mary Kay's quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject to these requirements, Mary Kay has lost control of the quality of goods that bear its trademarks.  For example, Mary Kay has no control over whether Defendants: (i) carry out the product inspection, storage, and handling requirements that IBOs are required to follow; or (ii)  sell products that are expired, damaged, defective, repackaged, or otherwise altered.

59.     Defendants are also interfering with Mary Kay's quality control and customer service requirements, among other ways, because Mary Kay cannot take any corrective action if Defendants sell poor-quality products or otherwise fail to abide by Mary Kay's quality control and

customer service requirements.  Defendants also do not provide personal services to consumers that Consultants are required to provide—and are not capable of providing such services—including providing advice, answering questions, and teaching customers how to safely use Mary Kay products because, as non-Consultants, they do not have access to the approved literature and other educational materials that IBOs are given to perform these services.

60.     The negative reviews on eBay of Mary Kay products that Defendants have sold also show that Defendants are exercising poor quality control and sales practices, providing poor customer service, and selling products bearing the Mary Kay Trademarks that are expired, previously used, tampered with, defective, counterfeit, or of otherwise poor quality.  *See supra* ¶¶ 32-33.  Thus, the products being sold by Defendants are also not genuine Mary Kay products because they do not abide by Mary Kay's quality control and customer service requirements that Consultants must follow.

61.     Through their unauthorized use of the Mary Kay Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Mary Kay products.  In reality, however, the products sold by Defendants are materially different from genuine Mary Kay products because they are not subject to, do not abide by, and interfere with Mary Kay's quality control and customer service requirements that Consultants must follow.

### Defendants Are Infringing the Mary Kay Trademarks by Selling Products Bearing The Mary Kay Trademarks That Do Not Come With the Mary Kay Satisfaction Guarantee

62.     As set forth above, Mary Kay products that are purchased from Consultants come with the Mary Kay Satisfaction Guarantee.  Mary Kay, however, does not provide the Satisfaction Guarantee for products purchased from any seller who is not a Consultant because Mary Kay

cannot ensure the quality of products sold by sellers that are not subject to Mary Kay's quality controls.

63.     Because Defendants are not Consultants and, thus, are not subject to Mary Kay's quality control requirements, the products they sell bearing the Mary Kay Trademarks do not come with the Satisfaction Guarantee.

64.     Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine Mary Kay products.

65.     The Satisfaction Guarantee is a material element of genuine Mary Kay products. Consumers considering whether to purchase Mary Kay products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Satisfaction Guarantee.  Consumers who purchase Mary Kay products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Mary Kay stands behind the product, and that they can get a refund, product replacement, or product exchange if they are dissatisfied with their product for any reason.

66.     Defendants' unauthorized sale of products bearing the Mary Kay Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Mary Kay products that come with the Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering With Mary Kay's Contracts With Consultants**

67.     As discussed, Mary Kay allows Mary Kay products to be sold to the public exclusively by Consultants.

68.     Mary Kay has entered into contracts with all of its Consultants that prohibit Consultants from selling Mary Kay products to persons or entities who resell the products.

Consultants are permitted to sell products only to end-user consumers, and only in quantities that are generally purchased by consumers for personal use.

69.     Upon information and belief, Defendants are not Consultants.  Despite this, Defendants have sold a very high volume of products bearing the Mary Kay Trademarks on the Internet.  As Defendants are not Consultants and are thus not able to purchase products from Mary Kay, the only reasonable explanation for how Defendants have been able to obtain the volume the products they have resold is by purchasing the products from Consultants.

70.     By purchasing Mary Kay products from Consultants and then reselling them on the Internet, Defendants caused and induced Consultants to breach their contracts with Mary Kay.

71.     Upon information and belief, Defendants know that Mary Kay's contracts with Consultants prohibit Consultants from selling Mary Kay products to third parties, such as Defendants, who are not ultimate consumers and who resell the products.  Mary Kay regularly broadcasts that it does not allow Mary Kay products to be sold on online marketplaces and retail websites such as eBay and Amazon, and experienced sellers of Mary Kay products—such as Defendants—are well aware that Consultants are prohibited from selling Mary Kay products on these websites or selling to resellers who sell on these websites.

72.     Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Mary Kay's contracts with its Consultants by actively seeking out Consultants and then encouraging, cajoling, and pressuring Consultants to breach their contracts by selling products to Defendants that Defendants resold on the Internet.

73.     Defendants had no legal right, privilege, or justification for their conduct. Defendants purchased Mary Kay products from Consultants—and in so doing, instigated a breach of the Consultants' contracts with Mary Kay—so that Defendants could resell the products as non-

21

Consultants who are not subject to and do abide by Mary Kay's quality controls, thereby unlawfully infringing upon and materially damaging the value of the Mary Kay Trademarks.

**Mary Kay Has Suffered Substantial Harm as a Result of Defendants' Conduct**

74.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, significant monetary harm including, but not limited to, loss of sales, damage to the value of its intellectual property, harm to the goodwill associated with the Mary Kay brand, and damage to its existing and potential business relations.

75.    Defendants' conduct was and is knowing, intentional, willful, malicious, wanton, and contrary to law.

76.    Mary Kay is entitled to injunctive relief because Defendants will otherwise continue to unlawfully sell products bearing the Mary Kay Trademarks that are materially different from genuine Mary Kay products sold by Consultants and are not subject to, interfere with, and do abide by Mary Kay's quality controls, thereby compromising Mary Kay's quality controls. Defendants' ongoing illegal conduct has caused and will continue to cause irreparable harm to Mary Kay's reputation, goodwill, business relationships, intellectual property, and brand integrity.

**Identification of Defendants**

77.    Because Defendants' "beyou-cosmetics" eBay storefront provides no contact information and Defendants appear to be using a false return address on products they ship to consumers following purchases from their storefront, Mary Kay has been unable to identify Defendants through its own investigation.

78.    In order to positively identify the Defendants who are operating the "beyou-cosmetics" eBay storefront and are responsible for infringing the Mary Kay Trademarks, tortuously interfering with Mary Kay's contracts and business relationships, and engaging in the

other conduct complained of herein, it will be necessary for Mary Kay to serve subpoenas on two third parties. Specifically, Mary Kay will need to serve limited discovery on: (1) eBay Inc., which possesses contact information provided by individuals and entities that operate storefronts on eBay; and (2) PayPal, Inc., a payment service that processes and keeps records of transactions made on eBay. Serving limited discovery on both of these third parties, rather than only one, will maximize the likelihood that Mary Kay is able to identify Defendants because: (i) while operators of eBay storefronts usually provide identifying information to both eBay Inc. and PayPal, Inc., it is more difficult for storefront operators to provide false information to PayPal, Inc. because it is a financial institution; (ii) although unusual, it is possible for sellers to operate eBay storefronts without providing information to PayPal, Inc.; and (iii) eBay sellers sometimes provide different or additional identifying information to eBay Inc. and PayPal, Inc., or update their information with one of these third parties while not updating their information with the other.

79.    Once Mary Kay has determined Defendants' identities through third party discovery, Mary Kay will name Defendants as parties to this action and pursue all available relief to which Mary Kay is entitled.

## FIRST CAUSE OF ACTION
### Trademark Infringement
### 15 U.S.C. §§ 1114 and 1125(a)(1)(a)

80.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

81.    Mary Kay owns the Mary Kay Trademarks.

82.    Mary Kay has registered the Mary Kay Trademarks with the United States Patent and Trademark Office.

83.    The Mary Kay Trademarks are valid and subsisting trademarks in full force and effect.

23

84.     Defendants have willfully and knowingly used, and continue to use, the Mary Kay Trademarks in commerce for the purpose of selling products on the Internet without Mary Kay's consent.

85.     The products that Defendants sell bearing the Mary Kay Trademarks are not authorized for sale by Mary Kay.

86.     Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Mary Kay Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Mary Kay.

87.     Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Mary Kay products.

88.     The products sold by Defendants are not, in fact, genuine Mary Kay products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Mary Kay's quality control requirements that Consultants must follow.

89.     Defendants' unauthorized use of the Mary Kay Trademarks has materially damaged the value of the Mary Kay Trademarks, caused significant damage to Mary Kay's business relations, and infringed on the Mary Kay Trademarks.

90.     As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

91.     Mary Kay is entitled to recover its damages caused by Defendants' infringement of the Mary Kay Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

92.     Mary Kay is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Mary Kay will suffer irreparable harm.

93.     Mary Kay is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Mary Kay Trademarks.

**SECOND CAUSE OF ACTION**
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

94.     Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

95.     Mary Kay owns the Mary Kay Trademarks.

96.     Mary Kay has registered the Mary Kay Trademarks with the United States Patent and Trademark Office.

97.     The Mary Kay Trademarks are valid and subsisting trademarks in full force and effect.

98.     Defendants have willfully and knowingly used, and continue to use, the Mary Kay Trademarks in commerce for the purpose of selling products on the Internet without Mary Kay's consent.

99.     The products that Defendants sell bearing the Mary Kay Trademarks are not authorized for sale by Mary Kay.

100.    Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Mary Kay Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Mary Kay when they are not.

101.    Defendants' use of the Mary Kay Trademarks in connection with their sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Mary Kay products when they are not.

102.    Defendants' unauthorized sale of products bearing the Mary Kay Trademarks and unauthorized use of the Mary Kay Trademarks in advertising infringes on the Mary Kay Trademarks.

103.    Defendants' unauthorized sale of products bearing the Mary Kay Trademarks and unauthorized use of the Mary Kay Trademarks in advertising has materially damaged the value of the Mary Kay Trademarks and has caused significant damages to Mary Kay's business relations.

104.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

105.    Mary Kay is entitled to recover its damages caused by Defendants' unfair competition and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

106.    Mary Kay is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Mary Kay will suffer irreparable harm.

107.     Mary Kay is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

### THIRD CAUSE OF ACTION
**Trademark Dilution**
**15 U.S.C. § 1125(c)**

108.     Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

109.     Products bearing the MARY KAY® trademark have been sold to the public since 1963.  For 57 years, Mary Kay has been recognized by consumers as the source of high quality products bearing the MARY KAY® trademark, beginning with cosmetics products and expanding to many other types of products.

110.     The MARY KAY® trademark was first filed with the United States Patent and Trademark Office in 1964, and was registered in 1966.  Since that time, the MARY KAY® trademark has been filed and registered with respect to numerous categories of goods and services.

111.     Mary Kay is the owner of the MARY KAY® trademark, and has registered the trademark with the United States Patent and Trademark Office.

112.     The MARY KAY® trademark is valid, subsisting, and in full force and effect.

113.     Mary Kay has expended substantial time, effort, money, and resources advertising and promoting products and services under the MARY KAY® trademark.  As a result of Mary Kay's efforts, the MARY KAY® trademark is the means by which Mary Kay products and services are distinguished from others in the marketplace.

114.     Mary Kay markets, advertises, and sells products bearing the MARY KAY® trademark throughout the United States.

115.    Mary Kay has implemented legitimate and substantial quality controls that it requires all Consultants to follow to protect the Mary Kay name and brand.

116.    Consumers throughout the United States recognize and associate the Mary Kay name with quality.

117.    Because of the quality, durability, and dependability of Mary Kay products and Mary Kay's use of the MARY KAY® trademark, consumers trust the Mary Kay name and Mary Kay products.

118.    The MARY KAY® trademark is inherently distinctive, and as a result of Mary Kay's long and continuous use of the MARY KAY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Mary Kay's products and services.

119.    Mary Kay is widely recognized by the general consuming public as the designated source of goods bearing the MARY KAY® trademark.

120.    For these reasons, since at least 1980, the MARY KAY® trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

121.    After the MARY KAY® trademark became famous, beginning in or around 2017, Defendants have willfully used the MARY KAY® trademark in connection with the unauthorized and illegal sale of products.

122.    Because the products sold by Defendants do not come with the Satisfaction Guarantee and are not subject to and do not abide by Mary Kay's quality controls, consumers who purchase products from Defendants are more likely to receive a poor quality, damaged, expired, or defective product and have an unsatisfactory customer experience.  Indeed, on eBay there are numerous negative reviews of products bearing the Mary Kay Trademarks that Defendants have

sold in which consumers complain about receiving products that were expired or of otherwise poor quality.

123.    Consumers who receive poor quality products that do not come with the Satisfaction Guarantee or customer service provided by Consultants are likely to associate that negative experience with Mary Kay and the MARY KAY® trademark. As a result, Defendants' unauthorized and willful use of the MARY KAY® trademark is tarnishing and diluting the value and distinctive quality of the MARY KAY® trademark.

124.    Defendants' unlawful actions have harmed the reputation and goodwill associated with the MARY KAY® trademark, and Mary Kay has suffered and will continue to suffer immediate and irreparable injury. Further, Defendants' actions have harmed and will continue to harm consumers interested in purchasing genuine Mary Kay products.

125.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

126.    Mary Kay is entitled to recover its damages caused by Defendants' dilution of the MARY KAY® trademark and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

127.    Mary Kay is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions, and unless Defendants are permanently enjoined, Mary Kay will suffer irreparable harm.

128.    Mary Kay is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in trademark dilution.

## FOURTH CAUSE OF ACTION
### Trademark Dilution
### Tex. Bus. & Com. Code § 16.103

129.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

130.    This claim arises under the laws of the State of Texas.

131.    Mary Kay is the owner of the MARY KAY® trademark, and has registered the trademark with the United States Patent and Trademark Office.

132.    The MARY KAY® trademark is valid, subsisting, and in full force and effect.

133.    Mary Kay has expended substantial time, effort, money, and resources advertising and promoting products and services under the MARY KAY® trademark.  As a result of Mary Kay's efforts, the MARY KAY® trademark is the means by which Mary Kay products and services are distinguished from others in the marketplace.

134.    Mary Kay markets, advertises, and sells products bearing the MARY KAY® trademark throughout the United States, including in Texas.

135.    Mary Kay has implemented legitimate and substantial quality controls that it requires all Consultants to follow to protect the Mary Kay name and brand.

136.    Consumers throughout the United States, including in Texas, recognize and associate the Mary Kay name with quality.

137.    Because of the quality, durability, and dependability of Mary Kay products and Mary Kay's use of the MARY KAY® trademark, consumers trust the Mary Kay name and Mary Kay products.

138.    The MARY KAY® trademark is inherently distinctive, and as a result of Mary Kay's long and continuous use of the MARY KAY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Mary Kay's products and services.

139.    Mary Kay is widely recognized by the general consuming public, including consumers in Texas, as the designated source of goods bearing the MARY KAY® trademark.

140.    For these reasons, since at least 1980, the MARY KAY® trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

141.    After the MARY KAY® trademark became famous, beginning in or around 2017, Defendants have willfully used the MARY KAY® trademark in connection with the unauthorized and illegal sale of products.

142.    Because the products sold by Defendants do not come with the Satisfaction Guarantee and are not subject to and do not abide by Mary Kay's quality controls, consumers who purchase products from Defendants are more likely to receive a poor quality, damaged, expired, or defective product and have an unsatisfactory customer experience.  Indeed, on eBay there are numerous negative reviews of products bearing the Mary Kay Trademarks that Defendants have sold in which consumers complain about receiving products that were expired or of otherwise poor quality.

143.    Consumers who receive poor quality products that do not come with the Satisfaction Guarantee or customer service provided by Consultants are likely to associate that negative experience with Mary Kay and the MARY KAY® trademark.  As a result, Defendants' unauthorized and willful use of the MARY KAY® trademark is tarnishing and diluting the value and distinctive quality of the MARY KAY® trademark.

144.    Defendants' unlawful actions have harmed the reputation and goodwill associated with the MARY KAY® trademark, and Mary Kay has suffered and will continue to suffer immediate and irreparable injury. Further, Defendants' actions have harmed and will continue to harm consumers interested in purchasing genuine Mary Kay products.

145.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

146.    Because Defendants have willfully, intentionally, maliciously, and in bad faith diluted the MARY KAY® trademark, this case qualifies for an award three times the amount of profits and damages and an award of attorneys' fees pursuant to Tex. Bus. & Com. Code §§ 16.103(c) and 16.104(c).

## FIFTH CAUSE OF ACTION
### Texas Common Law Trademark Infringement and Unfair Competition

147.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

148.    This claim arises under the laws of the State of Texas

149.    Mary Kay owns the Mary Kay Trademarks.

150.    Mary Kay has registered the Mary Kay Trademarks with the United States Patent and Trademark Office.

151.    The Mary Kay Trademarks are valid and subsisting trademarks in full force and effect.

152.    Defendants have willfully and knowingly used, and continue to use, the Mary Kay Trademarks in commerce for the purpose of selling products on the Internet without Mary Kay's consent.

32

153.    The products that Defendants sell bearing the Mary Kay Trademarks are not authorized for sale by Mary Kay.

154.    Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Mary Kay Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Mary Kay.

155.    Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Mary Kay products.

156.    The products sold by Defendants are not, in fact, genuine Mary Kay products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Mary Kay's quality control requirements that Consultants must follow.

157.    Defendants' unauthorized use of the Mary Kay Trademarks has materially damaged the value of the Mary Kay Trademarks, caused significant damage to Mary Kay's business relations, and infringed on the Mary Kay Trademarks.

158.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

159.    Mary Kay is entitled to recover its damages caused by Defendants' infringement of the Mary Kay Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

160.    In harming Mary Kay, Defendants have acted with willful misconduct and actual malice.  Accordingly, Mary Kay is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### Tortious Interference with Existing Contracts and Business Relationships

161.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

162.    This claim arises under the common law of the State of Texas.

163.    Mary Kay allows Mary Kay products to be sold to the public exclusively by Consultants.

164.    Mary Kay has entered into contracts with all of its Consultants that prohibit Consultants from selling Mary Kay products to persons or entities who resell the products. Consultants are permitted to sell products only to end-user consumers, and only in quantities that are generally purchased by consumers for personal use.

165.    Defendants have sold a very high volume of products bearing the Mary Kay Trademarks on the Internet.  As Defendants are not Consul tants and are thus not able to purchase products from Mary Kay, the only reasonable explanation for how Defendants have been able to obtain the volume of products they have resold is by purchasing the products from Consultants.

166.    By purchasing Mary Kay products from Consultants and then reselling them on the Internet, Defendants caused and induced Consultants to breach their contracts with Mary Kay.

167.    Defendants have known that Mary Kay's contracts with Consultants prohibit Consultants from selling Mary Kay products to third parties, such as Defendants, who are not ultimate consumers and who resell the products.

168.    Upon information and belief, Defendants know that Mary Kay's contracts with Consultants prohibit Consultants from selling Mary Kay products to third parties, such as

Defendants, who are not ultimate consumers and who resell the products. Mary Kay regularly broadcasts that it does not allow Mary Kay products to be sold on online marketplaces and retail websites such as eBay and Amazon, and experienced sellers of Mary Kay products—such as Defendants—are well aware that Consultants are prohibited from selling Mary Kay products on these websites or selling to resellers who sell on these websites.

169.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Mary Kay's contracts with its Consultants by actively seeking out Consultants and then encouraging, cajoling, and pressuring Consultants to breach their contracts by selling products to Defendants that Defendants resold on the Internet.

170.    Defendants had no legal right, privilege, or justification for their conduct. Defendants purchased Mary Kay products from Consultants—and in so doing, instigated a breach of the Consultants' contracts with Mary Kay—so that Defendants could resell the products as non-Consultants who are not subject to and do abide by Mary Kay's quality controls, thereby unlawfully infringing upon and materially damaging the value of the Mary Kay Trademarks.

171.    Mary Kay's contracts with its Consultants are a specific class of contract that Defendants are causing Consultants to breach when they purchase products from Consultants for resale. Although Mary Kay does not yet know which specific Consultant(s) have breached their contracts with Mary Kay—and indeed cannot learn this information with certainty until it is able to take discovery from Defendants in this action—Defendants know how they have obtained the products they resold and are on notice of the basis for Mary Kay's claim of tortious interference.

172.    Defendants are not parties to the contracts they caused Consultants to breach.

173.     As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, sales, goodwill, reputation, and its existing business relations.

174.     In interfering with Mary Kay's existing contracts and business relationships with its Consultants, Defendants have acted with willful misconduct and actual malice.  Accordingly, Mary Kay is entitled to an award of punitive damages.

## CONDITIONS PRECEDENT

175.     All conditions precedent to Mary Kay's claims for relief, if any, have occurred or have been performed.

## REQUEST FOR ATTORNEYS' FEES

176.     Mary Kay is entitled to recover its attorneys' fees and costs for this action, pursuant to the federal and state law identified herein, and Mary Kay hereby seeks such recovery from Defendants of all its reasonable and necessary attorneys' fees and costs for prosecuting this action and obtaining the relief requested herein.

## JURY DEMAND

177.     Plaintiff demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Mary Kay prays for relief and judgment as follows:

A.     Judgment in favor of Mary Kay and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, disgorgement of profits, punitive damages, exemplary damages, and pre-judgment and post-judgment interest as permitted by law;

B.     That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

      i)     Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Mary Kay products;

      ii)    Prohibiting the Enjoined Parties from using any of the Mary Kay Trademarks in any manner, including in advertising on the Internet;

      iii)   Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Mary Kay products as well as any products bearing any of the Mary Kay Trademarks;

      iv)   Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Mary Kay Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

      v)    Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Mary Kay's products, or any of the Mary Kay Trademarks;

      vi)   Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Mary Kay Trademarks which associate Mary Kay's products or the Mary Kay Trademarks with the Enjoined Parties or the Enjoined Parties' websites,

      vii)  Requiring the Enjoined Parties to take all action to remove the Mary Kay Trademarks from the Internet, including from the website www.ebay.com; and

      viii)  Requiring Defendants to destroy or return to Mary Kay all products bearing the Mary Kay Trademarks in their possession, custody, or control.

C.     An award of attorneys' fees, costs, and expenses; and

D.       Such other and further relief as the Court deems just, equitable and proper.

Respectfully submitted,

*/s/ Kent A. Britt*

Kent A. Britt
Ohio State Bar No. 0068182
kabritt@vorys.com
**VORYS, SATER, SEYMOUR AND PEASE LLP**
301 E 4th St, Suite 3500
Cincinnati, OH 45202
513-723-4488 – Telephone
513-852-7618 – Facsimile

Christopher J. Schwegmann
State Bar No. 24051315
cschwegmann@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 – Telephone
(214) 981-3829 – Facsimile

**ATTORNEYS FOR PLAINTIFF MARY KAY INC.**